**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| STACEY MILBRODT,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION,<br><br>Defendant. | CASE NO. 5:25-CV-02233-DCN<br><br>JUDGE DONALD C. NUGENT<br><br>MAGISTRATE JUDGE DARRELL A. CLAY<br><br>**REPORT AND RECOMMENDATION** |

## INTRODUCTION

Plaintiff Stacey Milbrodt challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter was referred to me under Local Civil Rule 72.2 to prepare a Report and Recommendation. (Non-document entry dated Oct. 20, 2025). For the reasons below, I recommend the District Court **AFFIRM** the Commissioner's decision denying DIB.

## PROCEDURAL BACKGROUND

On March 17, 2023, Ms. Milbrodt applied for DIB, alleging disability as of January 31, 2023 due to arthritis; fluid around her heart; bilateral foot pain; hammertoe; bunions; carpal tunnel syndrome; neck, back, and knee pain; poor circulation; Raynaud's disease; anxiety; depression; and migraines. (Tr. 193, 65). After her claim was denied initially and on reconsideration, Ms. Milbrodt requested a hearing before an administrative law judge. (Tr. 89, 100, 104). On August 22, 2024, Ms. Milbrodt (represented by counsel) and a vocational expert

(VE) testified before the ALJ. (Tr. 33-64). On September 5, 2024, the ALJ determined Ms. Milbrodt was not disabled. (Tr. 17-27). On August 19, 2025, the Appeals Council denied Ms. Milbrodt's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; *see also* 20 C.F.R. § 404.981). Ms. Milbrodt timely filed this action. (ECF #1).

## FACTUAL BACKGROUND

### I. Personal and Vocational Evidence

Ms. Milbrodt was 48 years old on the application date and 49 years old at the hearing. (*See* Tr. 65). She graduated high school and previously worked as a grinding machine tender. (*See* Tr. 40-41, 57).

### II. Relevant Medical Evidence[1]

Ms. Milbrodt has received treatment for depression and anxiety since at least March 2022. (*See* Tr. 384). Much of her depression stems from grief from losing her husband in September 2021 as well as several other losses in her family over the years. (*See* Tr. 411).

In the leadup to January 2023 (the month she claimed her disability began), she received regular medication management and counseling. (*See* Tr. 384, 397, 378, 380, 366, 407) (ordered chronologically). In May 2022, Ms. Milbrodt presented to her counselor struggling with the passing of her husband. (Tr. 397). A mental status examination noted a depressed mood and flat affect but otherwise normal findings. (Tr. 398-99). Her counselor noted "although client has recently lost husband to covid, client was experiencing a low level of depression due to other losses/grief for several years." (Tr. 398). In June 2022, Ms. Milbrodt's depression was aggravated by

[1] Although Ms. Milbrodt faces physical limitations (*see* Tr. 19, 38), her argument challenges the ALJ's analysis of her statements about her depression, grief, and anxiety (*see* ECF #9 at PageID 678-81). Accordingly, I limit my discussion to those conditions.

the death of her husband and dog, leaving her "unable to stop crying" during her appointment. (Tr. 378, 380). In October, Ms. Milbrodt returned to her counselor for her ongoing grief and a mental status examination yielded findings similar to May. (Tr. 407-08; *compare* Tr. 398-99).

In February 2023 (the first visit after she claimed her disability began), Ms. Milbrodt returned to her physician reporting worsening depression alongside a flareup of arthritis. (Tr. 353). She reported losing her job "due to deep depression." (*Id.*). She was still grieving her husband's passing and not being able to be with him during his passing. (*Id.*). A depression screening indicated severe depression and anxiety and Ms. Milbrodt "cried throughout the entire exam." (*Id.*).

Ms. Milbrodt returned for her regular counseling appointment in March. (Tr. 401-03). A mental status examination noted a depressed mood, clear speech, clear thought process, concrete thought and perceptions, intact memory, normal judgment, good insight, average intelligence, engaged and pleasant behavior, intact attention, and no suicidal thoughts. (Tr. 401). Ms. Milbrodt "discussed terminating her employment due to [her] stepmother's terminal illness." (Tr. 402). Also in March, she returned to her physician for depression and a flareup of arthritis. (Tr. 346). An examination revealed a flat affect and unstable mood, though her crying "improved from [February's] visit." (Tr. 350).

In April, Ms. Milbrodt spoke with a new counselor within the practice. (Tr. 410-11). She continued to struggle with the loss of her husband and expressed worry about her stepmother's poor health condition. (Tr. 411). A mental status examination noted a calm, relaxed, and depressed mood; clear speech and thought process; concrete thought and perceptions; intact memory; normal judgment; good insight and concentration; and cooperative, engaged, open, and

pleasant behavior. (Tr. 410). The note recounts "she finally took time off work to 'breathe and grieve'" as "she had to go back to work a couple of weeks after [her] husband's passing and it did not allow her to fully grieve." (Tr. 411).

In May 2023, Ms. Milbrodt returned to regular counseling where an examination noted similar findings as March and April. (Tr. 444; *compare* Tr. 401, 410). She struggled with the combined grief of losing several important family members and the recent two-year anniversary of one family member's passing. (Tr. 445). Ms. Milbrodt's counselor noted their records stopped after that visit because Ms. Milbrodt had been paying out-of-pocket and had difficulty affording treatment. (Tr. 447). Also in May, Ms. Milbrodt saw her physician whose examination noted normal mood and affect. (Tr. 461). Her physician noted her depression and anxiety were stable with her psychiatric medications. (Tr. 462).

Ms. Milbrodt followed up with her physician in July 2023. (Tr. 606). She reported still grieving the passing of her stepmother and, since her passing, Ms. Milbrodt's father "ha[d] become despondent" and that "exacerbat[ed] her grief." (*Id.*). An examination noted a flat mood and affect with "noted increased anxiety." (Tr. 606). Her physician also noted her psychological conditions were "stable with current regimen[]" of medications. (Tr. 607). In another appointment with her physician in November 2023, Ms. Milbrodt reported her depression and anxiety were responding well to her medications. (Tr. 600).

In March 2024, Ms. Milbrodt established care with a new psychiatrist and counselor. (Tr. 578). The psychiatric nurse practitioner diagnosed recurrent, moderate major depressive disorder and moderate and prolonged grief disorder, and increased her depression medication. (Tr. 578-79). Ms. Milbrodt returned twice in April. In the first visit at the start of the month, a

mental status examination noted normal findings and an intact functional status. (*See* Tr. 580). Ms. Milbrodt reported feeling "more numb," which she attributed to the increase in her antidepressant. (*Id.*). Ms. Milbrodt was assessed as "mildly worse" than her March visit and her antidepressant dosage was adjusted. (Tr. 582). At the second visit at the end of April, a mental status examination noted similar findings as the beginning of the month. (Tr. 583; *compare* Tr. 580). Ms. Milbrodt reported that she had not been to counseling in six weeks because she was helping a close friend whose mother had passed away. (*Id.*). She was assessed as "mildly improved from the last visit" and her medications were unchanged. (Tr. 585).

Ms. Milbrodt followed up as instructed in June 2024, the last visit before the August hearing with the ALJ. (*See* Tr. 586). A mental status examination again noted normal findings with an intact functional status. (*Id.*; *compare* Tr. 580, 583). Ms. Milbrodt reported her moods were "better" with her depression decreasing. (Tr. 586). She reported attending concerts though she "does get anxiety being around all the people" and felt like she made "small strides" in adjusting to life without her husband. (*Id.*). She was assessed as unchanged from her previous visit and her medications were kept steady. (Tr. 588).

## III. Relevant Opinion Evidence

On July 18, 2023, Ms. Milbrodt underwent a consultative psychological examination with Carolyn Arnold, Psy.D., in connection with her disability application. (Tr. 531-35). Dr. Arnold noted Ms. Milbrodt's mood was "sad, down, upset and worried," her affect was congruent with that mood, she was very tearful throughout the interview, and her speech was normal. (Tr. 534).

Dr. Arnold opined Ms. Milbrodt:

- Has a "reduced ability to function, work, feel mentally and emotionally stable and able to socialize and has a reduced tolerance for being down, sad and continually grieving the people she has lost recently and traumatically";
- Was distractible, was quite mentally fatigued, and had adapted to limitations by remaining at home in bed, self-isolating, and reducing activities;
- Can understand, remember and carry out instructions, follow a conversation and can think abstractly and apply reason; had intact short-term memory, less intact long-term memory and less intact mental flexibility; and
- Can sustain concentration and show persistence with simple tasks for a shorter period of time and multistep tasks for a short period of time.

(Tr. 534-35).

On August 18, 2023, state agency psychological consultant Robert Baker, Ph.D., reviewed Ms. Milbrodt's file and Dr. Arnold's opinion and opined she was not significantly limited in the areas covering understanding and memory, was moderately or not significantly limited in the areas covering sustaining concentration and pace, was moderately or not significantly limited in the areas covering social interaction, and moderately limited in responding appropriately to changes in the work setting. (Tr. 72-74). Dr. Baker explained Ms. Milbrodt could "concentrate sufficiently for the completion of 1-3 step tasks, maintain attention, make simple decisions, and adequately adhere to a schedule"; "work in settings that are not fast paced and where she is not required to meet strict production standards/quotas"; and work in a setting with "limited interaction with the general public and that involves occasional and superficial interactions with others" and "supervisors will need to provide constructive feedback." (Tr. 73-74).

On December 13, 2023, Ms. Milbrodt underwent a second consultative examination with a new psychologist, Kim Rosenzweig, Psy.D. (Tr. 569-75). Dr. Rosenzweig noted Ms. Milbrodt had

an anxious manner and spoke with a slow rate and monotonous rhythm of speech. (Tr. 571). Dr. Rosenzweig noted Ms. Milbrodt presented as depressed, "very irritated," and anxious with a broad range of affect; "cried throughout the session and was often unable to speak as a result"; and reported difficulty being around a lot of people, that she "can't deal with a lot of things." (Tr. 571-72). Dr. Rosenzweig opined Ms. Milbrodt:

- Can "apply instructions requiring low average intellectual functioning" though she "reported and exhibited minor impairment in memory; therefore, she may have some difficulty recalling more complex instructions";
- May "have some difficulties in sustaining concentration and persisting in work-related tasks" and "due to her tendency to be tangential in her thoughts, her pace is liable to be slower than desired by her employer";
- Is "very likely to have some limitations on her ability to respond appropriately to supervisors, peers, and others in the workplace due to her difficulty controlling her emotions"; and
- Is "likely to struggle in any type of stressful situation" and may be negatively impacted in "function[ing] well with normal pressures across settings."

(Tr. 574-75).

On reconsideration review in August 2023, state agency psychological consultant Ann Lovko, Ph.D., reviewed updated records and Dr. Rosenzweig's opinion and affirmed Dr. Baker's findings. (Tr. 369, 381).

## IV. Relevant Testimonial Evidence

Ms. Milbrodt described her psychological state as a "crying, emotional, and depressed mess." (Tr. 46). She described her mood as "pretty moody," that she "can be pretty bitchy," and she does not laugh or smile often. (Tr. 53). She experiences weekly anxiety attacks that can last up to 20 minutes. (Tr. 46-47). She will have crying spells about twice a day. (Tr. 47). She reported she "can't concentrate right," must "write everything down," and forgets things. (Tr. 43). Her

depression sometimes causes her not to care about showering. (*See* Tr. 53). Ms. Milbrodt attends monthly counseling and psychiatric appointments. (Tr. 46). She reported her medication helps with her anxiety attacks. (*Id.*).

Ms. Milbrodt explained she left her last job after taking time off to care for her hospitalized stepmother and running out of available leave. (Tr. 42). Her stepmother still required care, so, in lieu of being fired for excessive absences, Ms. Milbrodt left her job to continue caring for her stepmother. (*Id.*).

Ms. Milbrodt lives with her mother. (Tr. 48). They help each other with daily tasks such as cleaning and opening stuck jars. (*Id.*). They hire help to mow the yard. (*Id.*). She orders all that she needs online and has it delivered to her house. (*See* Tr. 47). Her mother goes to the grocery store, though Ms. Milbrodt goes grocery shopping "once in a while." (Tr. 47-48, 50). She has five good friends in town that she speaks with regularly over the phone. (Tr. 50). They meet about once a month. (Tr. 50). Most recently, she and her friends attended a concert at a music festival. (Tr. 51). Ms. Milbrodt remained in her seat once they arrived, and her friends brought her snacks. (*Id.*). She has little family left to contact. As both her stepfather and stepmother passed, she and both her parents are all widows. (*Id.*). Additionally, her aunt and uncle are both deceased. (*Id.*).

Ms. Milbrodt handles her father's healthcare because he suffers from the first stage of Alzheimer's disease; she attends his appointments with him and ensures he takes his medications. (Tr. 43, 48-49). Ms. Milbrodt can drive but prefers not to. (Tr. 49). She lives in a small town and stays in the area, except when she drives to take her father to his appointments. (*Id.*). She did not drive to the concert. (Tr. 51).

## STANDARD FOR DISABILITY

Eligibility for benefits turns on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 1382c(a)(3)(A); *see also* 20 C.F.R. § 404.1505(a).

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine whether a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?
2. Did claimant have a medically determinable impairment, or a combination of impairments, which is "severe," defined as one which substantially limits an individual's ability to perform basic work activities?
3. Does the severe impairment meet one of the listed impairments?
4. What is claimant's residual functional capacity and can claimant perform past relevant work?
5. Can claimant do any other work considering his or her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to prove whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine whether the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is the claimant deemed disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## THE ALJ'S DECISION

At Step One, the ALJ determined Ms. Milbrodt had not worked since the date she claimed her disability began. (Tr. 19). At Step Two, the ALJ identified degenerative disc disease of the lumbar and cervical spine, carpal tunnel syndrome, osteoarthritis, anxiety disorder, depressive/dysthymic disorder, and posttraumatic stress disorder as severe impairments. (*Id.*). At Step Three, the ALJ found Ms. Milbrodt's impairments did not meet or medically equal the requirements of a listed impairment. (Tr. 20-21).

At Step Four, the ALJ determined Ms. Milbrodt's RFC as follows:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that she can never climb ladders, ropes, or scaffolds; only occasionally climb ramps or stairs, stoop, kneel, crouch, or crawl; frequently reach overhead, handle, or finger (bilaterally); she cannot drive commercially; and she must avoid all exposure to hazards such as unprotected heights, or moving machinery. She can follow simple instructions which involve no more than simple work-related decision making; can interact with others occasionally, but those interactions must not involve arbitration, negotiation, or confrontation; she cannot direct the work of others, nor be responsible for the safety or welfare of others; she cannot work at a specific production rate (such as assembly line work, or jobs with hourly quotas); and she can tolerate no more than occasional workplace changes in a routine work setting.

(Tr. 21). The ALJ concluded Ms. Milbrodt could not perform her past relevant work as a grinding machine tender. (Tr. 25). At Step Five, the ALJ determined Ms. Milbrodt could perform other work in the national economy, including as a cleaner, marker, and routing clerk. (Tr. 26). Thus, the ALJ concluded Ms. Milbrodt was not disabled. (Tr. 27).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the

record." *Walters,* 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Apart from considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. *Walters,* 127 F.3d at 528. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not follow its

own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

## Discussion

Ms. Milbrodt argues the ALJ erred in evaluating her statements about the intensity and persistence of her symptoms under Social Security Ruling (SSR) 16-3p and 20 C.F.R. § 404.1529 and the ALJ did not consider her ability to sustain work under SSR 96-8p. (ECF #9 at PageID 677). The Commissioner responds that the ALJ applied multiple regulatory factors in evaluating Ms. Milbrodt's statements, substantial evidence supports that application, and Ms. Milbrodt's argument amounts to an impermissible invitation to reweigh the evidence. (ECF #10 at PageID 690-94).

An RFC is "the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996). A "regular and continuing basis" means eight hours a day, five days a week or an equivalent schedule. *Id.* The ALJ must base the RFC on all relevant evidence in the case record, including reports of daily activities, any medical source statements from acceptable medical sources, and information about the individual's symptoms. *See id.* In evaluating the claimant's

subjective reports of their symptoms, the ALJ must consider the claimant's complaints along with the objective medical evidence, treatment received, daily activities, and other evidence. *See* SSR 16-3p, 2017 WL 5180304, at *5-8 (Oct. 25, 2017). The ALJ need not accept a claimant's subjective complaints when they are inconsistent with the evidence. *Id.* at *8. The ALJ also uses the factors outlined in 20 C.F.R. § 404.1529(c)(3) to evaluate the claimant's statements:

1. A claimant's daily activities;
2. The location, duration, frequency, and intensity of pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, an individual receives or has received for relief from pain or other symptoms;
6. Any measures other than treatment an individual uses or used to relieve pain or other symptoms; and
7. Any other factor concerning an individual's functional limitations and restrictions due to pain and other symptoms.

The ALJ need not analyze all seven factors, only those germane to the alleged symptoms. *See Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 733 (N.D. Ohio 2005). The ALJ's evaluation of a claimant's statements is entitled to "great weight and deference" where substantial evidence supports it. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).

The ALJ evaluated Ms. Milbrodt's statements about her mental health symptoms together with the opinion evidence and found as follows:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.
>
> * * *
>
> Turning to her mental health, the record supports persistent symptoms of persistent grief and anxiety. The claimant lost her husband, and several family members in the years leading up to the alleged onset date. Her mental health records during the

relevant period are not consistent, but always center around unresolved grief in the years since she lost her husband. While records in February 2023 indicate that the claimant "lost" her job due to depression and arthritis symptoms, records in March 2023 note that the claimant "discussed terminating her employment due to [her] stepmother's terminal illness." The following month, in April 2023, the claimant indicated she "took time [off] work to 'breathe and grieve.'" The claimant's records support that she experiences moderate limitations in her ability to work due to symptoms of her mental health impairments, but not that her symptoms are of a degree which prevent her from working all together.

During consultative mental status examination with Dr. Carolyn Arnold, Psy.D., in July 2023, the claimant reported that she experiences symptoms of anxiety and depression relate to the loss of multiple family members. She was tearful, and her delayed recall was poor, but the claimant was showed good judgment, good immediate recall, and did not appear confused during any portion of the interview. She reported becoming overwhelmed easily, spending most of her time with her mother, and a few friends, or attending church on rare occasions. Dr. Arnold's opinion after interviewing the claimant is that she able to understand, remember and carry out instructions; she can follow a conversation and can think abstractly and apply reason when asked to interpret proverbs; she can sustain concentration and show persistence with simple tasks for a shorter period of time and multistep tasks for a short period of time, but was distractible and mentally fatigued; she has limited social interactions; she reported a history of responding adequately to workplace pressures, but has turned to self-isolating to reduce activities and avoid interactions and stressors. This opinion is generally persuasive, and consistent with the claimant's mental health records, which focus on unresolved grief, without specific indication as to how that grief affects her ability to work.

Several months later, the record indicates that the claimant continues to "respond well" to Celexa and Xanax. The following month, during a follow-up consultative examination with Dr. Kim Rosenzweig, Psy.D., the claimant confirmed that she was not in therapy at that time, but continued to benefit from Xanax. She again reported that she left her last job due to her stepmother's illness. She reported worrying and over-thinking when 'dealing with a lot of things,' and she will have panic attacks, but infrequently. Her performance during mental status examination was similar to her July 2023 interview with Dr. Arnold, showing deficits in delayed recall, but intact logical reasoning. Notably, the claimant was asked to count from 1 to 40 by 3s, but responded by counting by 1s, either showing a lack of attention to the task, or a lack of effort. When asked to perform simple math tasks, she would not attempt them, declaring, "I totally suck at math."

Overall, Dr. Rosenzweig opined that the claimant "may have some difficulty recalling more complex instructions;" "may have some difficulties in sustaining concentration and persisting in work-related tasks," and her "pace is liable to be slower than desired by her employer." She continued that the claimant is "very likely to have some

> limitations on her ability to respond appropriately to supervisors, peers, and others in the workplace due to her difficulty controlling her emotions;" and "is likely to struggle in any type of stressful situation. These characteristics may negatively impact her ability to function well with normal pressures across settings."
>
> This opinion overstates the limitations supported by the longitudinal record, and is not fully persuasive. The claimant reports helping her parents with activities of daily living, and attended a concert with a large crowd, performing tasks which Dr. Rosenzweig's opinion would appear to exclude. Subsequent to the consultative examination, the claimant reported that she "has been helping friends a lot. She is also helping her father." In June 2024, she reported she "has been able to attend concerts," and although she has some anxiety around that many people, she did not report any panic attack or other exacerbated symptoms. While the claimant continues to present as tearful when talking about the losses she has experienced, the complete record supports that she remains capable of following simple instructions and making simple work-related decisions. She should interact with others no more than occasionally, and those interactions should not involve arbitration, negotiation, or confrontation, nor should she be tasked with directing the work of others, or being responsible for the safety or welfare of others. The claimant's ability to concentrate and persist is moderately impaired, and she should not perform jobs which require a specific production rate (such as assembly line work, or jobs with hourly quotas). Lastly, the claimant indicates becoming overwhelmed easily, and she should be subjected to no more than occasional changes in a routine work setting.

(Tr. 22-24) (cleaned up).

The ALJ's discussion shows the ALJ compared Ms. Milbrodt's statements to the objective medical evidence, daily activities, and other evidence about her work history. *See* SSR 16-3p, 2017 WL 5180304, at *5-8. The ALJ's discussion also applied multiple regulatory factors, including Ms. Milbrodt's activities, the causes and triggers of her grief and anxiety, and her medications. *See* 20 C.F.R. § 404.1529(c)(3).

First, the ALJ noted how Ms. Milbrodt's symptoms led to her stopping working. She "lost her job due to depression and arthritis symptoms," then she "discussed terminating her employment due to her stepmother's terminal illness" and last, she "took time off work to breathe and grieve." (Tr. 23) (cleaned up). Those statements all appear in Ms. Milbrodt's counseling records. (*See* Tr. 353, 402, 411). As Ms. Milbrodt explained in the hearing, she left her last job

because she ran out of leave to care for her stepmother, so she quit in lieu of being fired for excessive absences. (Tr. 42).

Second, the ALJ extensively discussed how the opinions from Dr. Arnold and Dr. Rosenzweig do not support that Ms. Milbrodt is as limited as she claimed. (Tr. 23-24). SSR 16-3p instructs an ALJ to compare an individual's statements about claimed symptoms to the opinions of medical sources. *See* 2017 WL 5180304, at *6-7. The ALJ found Dr. Arnold's opinion to be generally persuasive in describing Ms. Milbrodt's condition, but was "without specific indication as to how that grief affects her ability to work." (Tr. 24). The RFC broadly matches Dr. Arnold's limitations. For instance, Dr. Arnold opined Ms. Milbrodt can "understand, remember and carry out instructions . . . had intact short-term memory, less intact long-term memory and less intact mental flexibility" and Ms. Milbrodt can "sustain concentration and show persistence with simple tasks for a shorter period of time and multistep tasks for a short period of time." (Tr. 534-35). The RFC limits Ms. Milbrodt to work involving "simple instructions which involve no more than simple work-related decision making" and absent "specific production rate[s] (such as assembly line work, or jobs with hourly quotas)." (Tr. 21). These limitations also align with Dr. Rosenzweig's opinion that Ms. Milbrodt "may have some difficulty" recalling more complex instructions and sustaining concentration and persisting in work-related tasks, and her "pace is liable to be slower than desired by her employer." (Tr. 574-75).

Third, the ALJ also discussed Ms. Milbrodt's daily activities, a relevant consideration under SSR 16-3p and 20 C.F.R. § 404.1529(c)(3)(i). The ALJ noted Ms. Milbrodt "help[ed] her parents with activities of daily living, and attended a concert with a large crowd"; "has been helping friends a lot" and "helping her father." (Tr. 24). The ALJ also noted Ms. Milbrodt "has turned to self-

isolating to reduce activities and avoid interactions and stressors." (Tr. 23-24). Though not a regulatory factor, SSR 16-3p instructs an ALJ to consider that an "individual may have structured his or her activities to minimize symptoms to a tolerable level by avoiding . . . mental stressors." *See* 2017 WL 5180304, at *9.

Fourth, the ALJ noted the precipitating and aggravating factors that worsen Ms. Milbrodt's mental health symptoms, a factor under 20 C.F.R. § 404.1529(c)(3)(iii). The ALJ noted Ms. Milbrodt "reported worrying and over-thinking when 'dealing with a lot of things,' and she will have panic attacks, but infrequently." (Tr. 24) (quoting Tr. 572). The ALJ incorporated that aggravating factor into the RFC, explaining "the claimant indicates becoming overwhelmed easily, and she should be subjected to no more than occasional changes in a routine work setting." (Tr. 24). The ALJ also noted Ms. Milbrodt overcame an aggravating factor of crowds, noting "although she has some anxiety around that many people, she did not report any panic attack or other exacerbated symptoms" when attending a concert. (Tr. 24; *see also* Tr. 51, 586).

Fifth, the ALJ also noted the effectiveness of Ms. Milbrodt's medications, a factor under 20 C.F.R. § 404.1529(c)(3)(iv). The ALJ noted she took Celexa and Xanax and responded well to both. (Tr. 24). Substantial evidence supports the ALJ's finding as multiple treatment records note Ms. Milbrodt responded well to her medications or her mental health conditions were stable with her medication regimen. (*See, e.g.*, Tr. 462, 600, 607).

Ms. Milbrodt does not argue that the ALJ did not apply the appropriate factors; rather she contends there is not an accurate and logical bridge from the evidence to the result. (ECF #9 at PageID 678). She contends the ALJ did not adequately address the severity of her mental health symptoms in finding that although she becomes "tearful when talking about the losses she has

experienced, the complete record supports that she is capable" of working. (*Id.*). In support, she argues:

- Her conditions "requir[e] medication management and counseling."
- She experiences weekly anxiety attacks lasting 20 minutes and twice-daily crying spells.
- At various appointments and a consultative examination, she was "unable to stop crying," "crying," "very tearful," and "tearful."
- She reported job loss due to depression and she cried throughout the entire exam in February 2023 and screening was positive for severe depression and anxiety.
- Dr. Arnold opined Milbrodt was distractible and had reduced ability to function.
- Dr. Rosenzweig opined Ms. Milbrodt would likely struggle in any type of stressful situation and her characteristics may negatively affect her ability to function well with normal pressures across settings and that her pace would be slower than what an employer would like.

(*See* ECF #9 at PageID 679-80).

But "a Plaintiff does not demonstrate a violation of SSR 16-3p simply by reiterating the same subjective symptoms she believes should have been credited by the ALJ." *Zingale v. Kijakazi*, No. 1:20-cv-2197, 2022 WL 824148, at *8 (N.D. Ohio Mar. 18, 2022). This is so because the ALJ need not accept a claimant's subjective complaints; the ALJ may discount subjective testimony that is inconsistent with the record evidence. *Jones*, 336 F.3d at 475-76. It remains "for the [ALJ], not the reviewing court, to judge the consistency of a claimant's statements." *Lipanye v. Comm'r of Soc. Sec.*, 802 F.App'x 165, 171 (6th Cir. 2020). A reviewing court is limited to evaluating whether the ALJ's explanations for discrediting an individual's testimony are reasonable and supported by substantial evidence in the record. *Jones*, 336 F.3d at 476. Ms. Milbrodt's argument that the ALJ is

simply wrong and her subjective complaints are consistent with the record invites the court to reweigh the evidence, find her condition warrants greater limitations than the ALJ found, and find the consultative examiners' opinions more persuasive, none of which the court can do. *See Nasser v. Comm'r of Soc. Sec.*, No. 22-1293, 2022 WL 17348838, at *2 (6th Cir. Dec. 1, 2022).

This is also not a case "where substantial record evidence pointed towards the claimant having a severe impairment, and the ALJ nonetheless chose to ignore that evidence." *See Napier v. Comm'r of Soc. Sec.*, 127 F.4th 1000, 1006 (6th Cir. 2025). The ALJ considered the evidence Ms. Milbrodt advances today. The ALJ noted she was tearful in the consultative examination with Dr. Arnold. (Tr. 23). Later the ALJ noted Ms. Milbrodt's "mental status examination was similar" in the examination with Dr. Rozenzweig. (Tr. 24). The ALJ recounted Ms. Milbrodt reportedly losing jobs due to depression and arthritis or caring for her terminally ill stepmother, but that it was unclear if she was fired or chose to leave. (Tr. 23). The ALJ also discussed both the consultative examinations and their findings that Ms. Milbrodt would work at a reduced pace. (Tr. 23-24). Accordingly, the ALJ limited her from working "at a specific production rate (such as assembly line work, or jobs with hourly quotas)." (Tr. 21). After all, the ALJ did not determine Ms. Milbrodt had no limitations, but rather the ALJ found she was "not so limited as she alleged." *See Medina v. Comm'r of Soc. Sec.*, No. 1:22-cv-762, 2023 WL 3456920, at *10 (N.D. Ohio Apr. 17, 2023).

Ms. Milbrodt also contends that when the ALJ considered her reported ability to attend concerts and help friends and family, "the ALJ did not factor in periods of waxing and waning and sustained activities" [sic] when discounting Dr. Rosenzweig's opinion as overstating Ms. Milbrodt's limitations. (ECF #9 at PageID 680). It is not clear if Ms. Milbrodt is challenging the ALJ's evaluation of Dr. Rosenzweig's opinion. Ms. Milbrodt does not mention the regulations governing

how ALJs evaluate medical opinions nor explain how her symptoms wax and wane. Thus, to the extent she makes a separate argument that the ALJ mis-evaluated Dr. Rosenzweig's opinion, that argument is waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones") (internal citations omitted).

Ms. Milbrodt may have intended the argument to mean the ALJ did not consider whether she can perform those activities on a sustained basis considering the fluctuating severity of her symptoms. Indeed, the functional limitations of mental impairments are to be assessed on the claimant's ability to do activities on a sustained basis. *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 377 (6th Cir. 2013). It is generally recognized that symptoms of mental health impairments are not always static, and a claimant may experience ups and downs that affect the claimant's functional abilities. *See, e.g., Phillips v. Astrue,* 413 F. App'x 878, 886 (7th Cir. 2010) (recognizing many mental illnesses are characterized by good days and bad days, rapid fluctuations in mood, or recurrent cycles of waxing and waning symptoms). In short, what may have been possible on a good day may not be possible on a bad day. Thus, an ALJ's failure to consider that psychological symptoms may wax and wane can—in conjunction with other errors—be indicative that the ALJ did not consider the entire record. *See Keyse v. Saul*, No. 1:19-cv-2495, 2021 WL 1214691, at *20 (N.D. Ohio Mar. 31, 2021).

Here, the ALJ reviewed the longitudinal record and determined the evidence "supports persistent symptoms of persistent grief and anxiety," and her symptoms result in moderate limitations and do not prevent her from working all together. (Tr. 23). The more recent records

indicate Ms. Milbrodt's psychological conditions were steady outside of when her grief was heightened by holidays and anniversaries. (*See, e.g.*, Tr. 445, 580, 583, 586). Thus, substantial evidence supports the ALJ's conclusions about the severity of Ms. Milbrodt's symptoms. Ms. Milbrodt does not identify evidence the ALJ failed to consider (such as periods of waxing and waning symptoms) or evidence suggesting she is more functionally impaired during periods of increased symptom severity. Nor does my review of the record show evidence of that nature.

I thus decline to recommend remand on any of these bases.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **AFFIRM** the Commissioner's decision denying disability insurance benefits.

Dated: August 19, 2026

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

## OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health & Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-cv-186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).